## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

FISHERIES SURVIVAL FUND
2 Middle Street, Fairhaven, MA 02719,

BOROUGH OF BARNEGAT LIGHT, NJ
110 E 7th Street, Barnegat Light, NJ 08006,

THE TOWN DOCK
45 State Street, Narragansett, RI 02882,

SEAFREEZE SHORESIDE
75 State Street, Narragansett – Point Judith, RI, 02882,

SEA FRESH USA
45 All American Way, North Kingstown, RI 02852

GARDEN STATE SEAFOOD ASSOCIATION
212 West State Street, Trenton, NJ 08608,

RHODE ISLAND FISHERMEN'S ALLIANCE,
Brayton Street, East Greenwich, RI 02818

LONG ISLAND COMMERCIAL FISHING
ASSOCIATION, INC.
148 West Lake Drive, Montauk, NY 11954,

TOWN OF NARRAGANSETT, RHODE ISLAND
25 Fifth Avenue, Narragansett, RI 02882,

NARRAGANSETT CHAMBER OF COMMERCE
36 Ocean Road, Narragansett, RI 02882,

CITY OF NEW BEDFORD, MASSACHUSETTS
133 William Street, New Bedford, MA 02740,

and

POINT PLEASANT (NJ) DOCK CO-OPERATIVE
57 Channel Drive, Point Pleasant Beach, NJ 08742,

*Plaintiffs,*

- vs. -

Case: 1:16-cv-02409          (D-Deck)
Assigned To : Chutkan, Tanya S.
Assign. Date : 12/8/2016
Description: TRO/PI

THE HONORABLE SALLY JEWELL, *in her official capacity as the Secretary of the Interior*
United States Department of the Interior
1849 C Street, N.W.
Washington, DC 20240,

and

THE BUREAU OF OCEAN ENERGY MANAGEMENT
United States Department of the Interior
1849 C Street, N.W.
Washington, DC 20240,

                    *Defendants.*

## COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

Dated: December 7, 2016

DAVID E. FRULLA
D.C. Bar No. 414170

ANDREW E. MINKIEWICZ
D.C. Bar No. 981552

ELIZABETH C. JOHNSON
D.C. Bar No. 987429

KELLEY DRYE & WARREN LLP
3050 K Street, N.W. – Suite 400
Washington, D.C.  20007
Telephone: (202) 342-8400
Facsimile: (202) 342-8451

*Attorneys for Plaintiffs*

# I.    **INTRODUCTION**

1.     Plaintiffs Fisheries Survival Fund ("FSF"), the Borough of Barnegat Light, New Jersey, Town Dock, Seafreeze Shoreside ("Seafreeze"), Sea Fresh USA, Garden State Seafood Association ("GSSA"), Long Island Commercial Fishing Association, Inc. ("LICFA"), Rhode Island Fishermen's Alliance ("RIFA"), the Town of Narragansett, Rhode Island, the Narragansett Chamber of Commerce ("NCC"), the City of New Bedford, Massachusetts, and the Point Pleasant (NJ) Dock Co-Operative ("Point Pleasant Co-Op") (collectively, "Plaintiffs") challenge the Secretary of the Department of the Interior, the Honorable Sally Jewell, and the Bureau of Ocean Energy Management ("BOEM") (collectively, "Federal Defendants"), proceeding with the final sale of Lease OCS–A 0512 (the "Lease") for the development of a wind farm project in an area designated as the New York Wind Energy Area ("NY WEA"), in the "exclusive economic zone," beginning approximately 11 miles off the coast of New York state.

2.     The Lease confers upon the lessees the exclusive right to develop a windfarm in the NY WEA.  The lessees are private developers that seek to build a 127 square-mile, 194-turbine offshore wind farm on top of historic offshore fishing grounds that comprise important habitat for a wide range of fish species, as well as protected right whales and sea turtles, in an area that is sandwiched precariously between the shipping lanes into and out of New York Harbor.

3.     Siting is the most important issue for ocean users.  However, in preparing to issue the Lease, BOEM has never considered whether an alternative site would better protect preexisting users of the NY WEA and the benthic resources upon which they rely.  Instead, BOEM decided to defer any analysis of whether or not the NY WEA was an appropriate site until years from now, after the developers have already invested substantial sums into

**Complaint**                              Page 3

development of the site.  At that point, it will not be possible to consider reasonably alternative sites for the wind project.  In effect, BOEM has permitted private companies to lay claim to valuable ocean areas without an adequate public process. Siting was determined based solely on the availability of the wind resource and proximity to the electrical grid. This decision occurred in advance of public input and without consideration of alternative sites, in violation of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706; the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-4370e; and the Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C. § 1331, *et seq.*

## II.    PARTIES

4.      Plaintiff FSF is an organization formed in 1998 that represents the vast majority of the Limited Access Scallop Fleet.  FSF was organized to address regulatory proposals that threatened to bankrupt the industry and to develop better scientific information about the scallop resource and better approaches to scallop conservation and management.  FSF has significantly more than 200 current participants homeported from Massachusetts to North Carolina, each of whom primarily, if not entirely, fish for scallops using scallop dredges.

5.      Plaintiff Borough of Barnegat Light, New Jersey, is known for the Barnegat Lighthouse.  The town's primary economic drivers are tourism and fishing. Borough residents include scallop fishermen (including members of plaintiff FSF) and other commercial fishermen adversely affected by the lease decision.  Its residents more generally also are adversely affected by the lease decision and have an interest in a healthy and sustainable ocean ecosystem that forms the pillar for the Borough's marine and fishing heritage. The Borough has an interest in the protection of natural resources and development of alternative sources of energy for the

future and supports the development of offshore alternative energy that takes into account the needs of fishing communities.

6.      Plaintiff Town Dock is the largest supplier of squid in the United States.  It also sells a variety of frozen seafood products across the globe.  The Town Dock owns seven fishing vessels, all of which fish primarily for squid, and buys squid from an additional 30 independently-owned vessels.  All of the vessels are federally-permitted and actively fish in the NY WEA, which is one of the four or five most important areas to the squid fishery.  The Town Dock employs 84 workers.

7.      Plaintiff Seafreeze is one of the largest fish dealers in Point Judith, Rhode Island, with sales in both domestic and international markets.  Seafreeze purchases, sells, and processes product – primarily squid – from its own customers and other local wholesalers.  Seafreeze is also the primary supplier of ice to squid fishing vessels in Port Judith.  Seafreeze owns one federally permitted vessel, which supplies Seafreeze with squid and other species, and services approximately 30 independently owned vessels, many of which are federally permitted squid vessels.  Seafreeze employs approximately 40 people, including temporary workers.  Squid is vital to Seafreeze's business and the vessels it services.  In addition to participating in fishery management processes, Seafreeze has long supported cooperative research and works to enhance scientific understanding of fisheries resources and the environment in which they are located.

8.      Plaintiff Sea Fresh USA is a fully-integrated supplier and processor of premium seafood products.  Sea Fresh USA has docks and processing facilities in Rhode Island and Maine.  Sea Fresh USA's Port Judith wharf is where it receives squid that is cleaned and turned into high quality calamari.

9.      Plaintiff GSSA is comprised of New Jersey commercial fishermen, shore-based seafood processors, commercial dock facilities, seafood markets and restaurants, and various New Jersey-based commercial fishing industry support businesses. The GSSA membership represents every major port in the State, harvesting approximately $100 million dollars' worth of seafood products annually, supporting 2,000 jobs, and contributing significantly to the coastal economy of the State of New Jersey.

10.     Plaintiff LICFA is a commercial fishing industry group representing New York's commercial fishermen and fishing industry in 11 gear groups in 14 ports on Long Island. LICFA represents owners and operators from over 150 fishing businesses, boats, and fishermen who are home-ported on Long Island and who fish in state and federal waters that include the NY WEA. LICFA and its members support extensive scientific research aimed at improving understanding of the marine environment, in addition to engaging in fisheries management and outreach.

11.     Plaintiff RIFA is a trade organization dedicated to helping create sustainable fisheries without putting licensed fishermen out of business.

12.     Plaintiff Town of Narragansett, Rhode Island, is known for its summer recreation and beaches and is home to one of the campuses of the National Marine Fisheries Service. Its residents are adversely affected by the lease decision and have an interest in a healthy and sustainable ocean ecosystem that forms the pillar of the Town's marine and fishing heritage. The village of Point Judith, within the Town of Narragansett, is home to the fishing industry, including the squid businesses that are Plaintiffs in this action. The Town has an interest in the protection of natural resources and development of alternative sources of energy for the future and supports the development of offshore alternative energy that takes into account the needs of fishing communities.

13.     Plaintiff NCC is organized for the purpose of advancing the commercial, industrial, recreational, civic, and general interests of the Town of Narragansett, Rhode Island, including its fishing industry and affiliated and supporting shoreside businesses.

14.     Plaintiff City of New Bedford, Massachusetts is the nation's most economically productive fishing port with annual fish landings valued at $369 million. The city is New England's seafood hub, with more than 30 processors and distributors, ranging in size from high-volume international wholesale to small-scale local retail. Many of the fishing vessels from the city of New Bedford, including scalloper members of FSF and squid fishermen, fish in and around the NY WEA. The City has a deep history of supporting wind energy and has made significant investments in infrastructure in order to support the development of offshore wind energy. The City and port are committed to sustainable fisheries and the protection of the natural environment. Its residents are adversely affected by the lease decision and have an interest in a healthy and sustainable ocean ecosystem that forms the pillar of the City's marine and fishing heritage.

15.     Plaintiff Point Pleasant Co-Op was incorporated in 1953 and is one of the oldest continuously operating fishing cooperatives in the country. The Point Pleasant Co-Op has eleven members with ten member boats. Point Pleasant Co-Op services member boats and another 40 non-member vessels. Last year the co-op packed out close to $15 million worth of seafood, of which roughly two-thirds were scallops. Point Pleasant ranks among the top three of all ports on the East Coast in summer flounder, scup, and black sea bass landings, and in the top ten ports for scallops. The Co-op represents over three-quarters of those landings in Point Pleasant.

16.     Defendant, the Honorable Sally Jewell, is the Secretary of the U.S. Department of Interior. Defendant, by and through her designees at FWS, undertook the illegal and

unauthorized actions which are challenged in this case.  Secretary Jewell is sued solely in her official capacity.

17.    Defendant Bureau of Ocean Energy Management ("BOEM") is a federal agency within the Department of the Interior and to which Defendant Secretary of Interior has delegated the authority to administer the OCSLA. *See* 30 C.F.R. § 585.100.

### III.    JURISDICTION AND VENUE

18.    Plaintiffs bring this action under the APA, 5 U.S.C. § 706; NEPA, 42 U.S.C. §§ 4321-4370e; and the OCSLA, 43 U.S.C. § 1331, *et seq.*

19.    This court has subject matter jurisdiction pursuant to 5 U.S.C. §§ 701-06 (APA judicial review provisions); 28 U.S.C. § 2201 (Declaratory Judgment Act); and 43 U.S.C. § 1349 (OCSLA citizen suit provision).   The relief request is authorized by 28 U.S.C. § 2201 (declaratory judgment), 28 U.S.C. § 2202 (injunctive relief), 5 U.S.C. § 701-706; and 43 U.S.C. § 1349 (OCSLA citizen suit provision)

20.    This Court also has jurisdiction pursuant to 28 U.S.C. § 1331, which grants the district courts "original jurisdiction of all civil actions arising under the … laws … of the United States."

21.    Venue lies in this Court pursuant to 28 U.S.C. § 1391(e), as the Defendant Secretary of Interior is an officer of the United States and BOEM is an agency of the United States.

22.    An actual, justiciable controversy exists between the parties within the meaning of the 28 U.S.C. § 2201.

23.    The Federal Government has waived sovereign immunity in this action pursuant to 5 U.S.C. § 702 and 43 U.S.C. § 1349.

24.     Plaintiffs have exhausted all administrative remedies, the agency action challenged is final and ripe for review, and, as shown herein, association Plaintiffs have standing to bring these claims because "(a) [their] members would otherwise have standing to sue in their own right; (b) the interests [they] seek[s] to protect are germane to the organizations' [purposes]; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977).

## IV.   <u>LEGAL BACKGROUND</u>

### A.     The Outer Continental Shelf Lands Act and Implementing Regulations

25.     The United States Congress adopted the OCSLA in August 1953, which authorized the Secretary of the Interior to administer mineral exploration and development of the Outer Continental Shelf ("OCS"). Under the OCSLA, the Secretary grants leases to the highest qualified bidder on the basis of competitive bids, and formulates regulations as necessary to carry out the provisions of the Act. 43 U.S.C. §§ 1331-1356.

26.     The OCSLA requires, however, that "the character of the waters above the outer continental shelf as high seas and the right to navigation and fishing therein shall not be affected" by BOEM's leasing of OCS submerged lands. *Id.* § 1332(2).

27.     In 2005, Congress amended the OCSLA through the Energy Policy Act ("EPAct"). The EPAct authorized the Secretary of the Interior to grant rights of way, easements, and leases of OCS for activities that produce and support production of energy from sources other than oil and gas. The Secretary delegated this authority to the Mineral Management Service ("MMS").

28.    In so doing, the EPAct imposed a legal obligation upon BOEM to protect existing "reasonable uses," such as commercial fishing, and consider areas for fishing and navigational purposes. 43 U.S.C. §§ 1337(p)(4)(I), (J).

29.    The renewable ocean energy provisions of EPAct 2005 led to an extensive MMS rulemaking process that culminated in an April 2009 rulemaking (the "Lease Rule"). 74 Fed. Reg. 19638 (April 29, 2009).

30.    The MMS was divided into three independent entities by Secretarial Order on May 19, 2010. Secretary Ken Salazar, Dep't of Interior, Order No. 3299 (May. 19, 2010). The MMS was renamed the Bureau of Ocean Energy Management, Regulation and Enforcement ("BOEMRE"). On October 1, 2011, BOEMRE was renamed again as the Bureau of Ocean Energy Management ("BOEM"), and BOEM retained authority to administer provisions of the OCSLA and EPAct.

31.    In 2011, BOEM issued revisions to the Lease Rule, 76 Fed. Reg. 28178 (May 16, 2011) (amending 30 C.F.R. part 285), which it referred to as the "Smart from the Start" policy.

32.    The alleged intent of "Smart from the Start" was to streamline review and approval of offshore wind energy leases.

33.    Issuance of a lease grants the lessee the exclusive right to seek BOEM approval for development of the leasehold (i.e., it grants the lessee the right to use the leased area to develop its plans).

34.    Under these regulations, the wind leasing process can either be solicited or unsolicited, and competitive or non-competitive.

35.    In a solicited leasing process, BOEM selects areas for wind energy development based on input from Intergovernmental Renewable Energy Task Forces that BOEM established

in each state when requested by that state's governor, along with other interested parties. In an unsolicited process, a developer can propose to lease any area of the ocean for a wind energy facility.

36.     Once an area is identified for wind energy development, whether solicited or unsolicited, BOEM issues a Request for Interest, with the purpose of determining whether competitive interest exists. 30 C.F.R. § 585.210, 585.231(b). Any other developer may then inform BOEM that it is interested in submitting a lease application for that area.

37.     If competitive interest exists, BOEM issues a Proposed Sale Notice to the governors of potentially affected states, who have 60 days to comment before BOEM may issue a Final Sale Notice. The regulations do not require an accompanying formal public comment period. If no competitive interest exists, BOEM proceeds directly to lease negotiation with the interested developer.

38.     "Smart from the Start" removed important opportunities for public comment. Under the 2009 Lease Rule pre-dating "Smart from the Start," the issuance of a lease and subsequent approval of wind energy development on the OCS was a staged decision-making process that occurred in four distinct phases: (1) planning and analysis; (2) lease issuance; (3) approval of a Site Assessment Plan; and (4) approval of a Construction and Operations Plan. The first phase was to identify suitable areas for wind energy leasing consideration through processes that provided for public outreach and consultation.

39.     In its "Smart from the Start" rulemaking, BOEM combined the first three steps of the Lease Rule process with just one opportunity for public comment upon receipt of such an unsolicited proposal. BOEM only issues a Call for Information from the public after energy companies spend substantial time and money resources developing a specific bid.

**Complaint**                                    Page 11

40.    The result of this policy and its regulations is that BOEM, in effect, enables private companies to lay claim to valuable ocean areas without an adequate public process. The most important decision with regard to wind lease issuance—the site to be leased—is determined based solely on the availability of the wind resource and proximity to the electrical grid. This decision occurs in advance of public input, without consideration of alternative sites.

**B.    The National Environmental Policy Act**

41.    NEPA is "our basic national charter for protection of the environment." 40 C.F.R. § 150.1(a).

42.    NEPA, 42 U.S.C. §§ 4321-4370f, "'has twin aims' of 'plac[ing] upon an agency the obligation to consider every significant aspect of the environmental impact of a proposed action' and 'ensur[ing] that the agency will inform the public that it has indeed considered environmental concerns in its decisionmaking process.'"

43.    NEPA and the regulations promulgated thereunder by the Council on Environmental Quality ("CEQ") require that all federal agencies prepare an environmental impact statement ("EIS") for all "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C); *see also* 40 C.F.R. § 1501.4.

44.    An agency may first prepare a detailed Environmental Assessment ("EA") to determine whether the action may significantly affect the environment and whether it requires a full EIS. 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1508.9. An EA is "a concise public document" that serves, among other things, to "provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact." *Id.* As with any document prepared under NEPA, an environmental assessment is intended to

"ensure that environmental information is available to public officials and citizens before decisions are made and before actions are taken." 40 C.F.R. § 1500.1(b).

45.    If, after preparing an EA, the agency determines an EIS is not required, the agency must provide a "convincing statement of reasons" why the project's impacts are insignificant and issue a Finding of No Significant Impact or "FONSI." 40 C.F.R. §§ 1501.4, 1508.9 & 1508.13.

46.    In either an EA or an EIS, the agency must consider alternatives to the proposed action.

47.    In undertaking a NEPA analysis, agencies must 'take a 'hard look' at [the] environmental consequences' of their actions, and 'provide for broad dissemination of relevant environmental information.'" *Public Employees for Envt'l Responsibility v. Hopper*, 827 F.3d 1077, 1081 (D.C. Cir. 2016) ("*PEER*").

48.    In its NEPA analysis, an agency cannot "segment" its "NEPA review [by] divid[ing] connected, cumulative, or similar federal actions into separate projects and thereby fail[ing] to address the true scope and impact of the activities that should be under consideration." *Delaware Riverkeeper Network v. FERC*, 753 F. 3d 1304, 1313 (D.C. Cir. 2014).

## V.    FACTUAL ALLEGATIONS

### A.    The New York Wind Energy Area

49.    On September 8, 2011, BOEM received an unsolicited request for a wind energy lease from a consortium consisting of the New York Power Authority ("NYPA"), Long Island Power Authority ("LIPA"), and Consolidated Edison ("ConEd") (collectively, "the Consortium").

50. The application proposed to develop a facility on approximately 81,500 acres of the outer continental shelf up to 194, 3.6 megawatt (MW) wind turbines, which would yield up to 700 MW of wind energy.

51. On June 20, 2012, NYPA submitted a letter to BOEM requesting to include 74 additional OCS sub-blocks in response to guidance from the United States Coast Guard that a minimum of one nautical mile minimum distance was required between shipping lanes and any proposed wind turbines. The amended application requested a lease in five whole OCS blocks and 148 sub-blocks. The area begins approximately eleven nautical miles south of Long Beach, New York. From its western edge, the area extends approximately 26 nautical miles southeast at its longest portion. The application amendment states that the entire area is approximately 127 square miles, or 81,130 acres.

52. Neither the application nor its amendment offered evidence that the Consortium considered alternative sites for, nor solicited public input on, its wind energy lease request.

53. Nor did BOEM seek public input on conflicts with the site, as it moved through the stages of its leasing process. On Jan. 4 2013, BOEM issued a Request for Interest ("RFI") in the Federal Register with the purpose of assessing whether there were other parties interested in developing commercial wind facilities in the same area proposed by NYPA. 78 Fed. Reg. 760 (Jan 4, 2013). The RFI was not intended to identify alternative areas or assess controversiality.

54. After reviewing nominations of interest received in response to the Request for Interest, BOEM determined that competitive interest in the area proposed by NYPA existed, and initiated the competitive leasing process pursuant to 30 C.F.R. 585.211.

55. Subsequently, on May 28, 2014, BOEM published a "Call for Information and Nominations" ("Call") to seek additional nominations from companies interested in commercial

wind energy leases within the Call area offshore New York. 79 Fed. Reg. 30645 (May 28, 2014).

BOEM also sought public input on the potential for wind development in the Call Area,

including comments on site conditions, resources, and existing uses of the area that would be

relevant to BOEM's wind energy development authorization process.  A map of the NY WEA is

below:



New York Proposed Lease Area

56.     On May 28, 2014, BOEM also published a Notice of Intent ("NOI") to prepare an

Environmental Assessment. 79 Fed. Reg. 30643 (May 28, 2014). The purpose of the EA is to

determine whether there are significant impacts associated with the discrete act of issuing a

lease, conducting site characterization surveys, and conducting site assessment activities (e.g.,

the installation of a meteorological tower and/or buoys) within the proposed area. Through the

NOI, BOEM stated that it sought public input on the environmental and socioeconomic issues to

be considered, as well as alternatives and mitigation measures, relating to the discrete act of issuing a lease, conducting site characterization surveys, and conducting site assessment activities (e.g., the installation of a meteorological tower and/or buoys) within the proposed area.

57. As part of its process for issuance of competitive leases, BOEM performs an "Area Identification" process to "identify areas for environmental analysis and consideration for leasing… in consultation with appropriate Federal agencies, States, local governments, affected Indian Tribes, and other interested parties." 30 C.F.R. 585.211(b).

58. On March 16, 2016, BOEM announced that it had completed its Area Identification process for the area nominated by the Consortium.[1] The statement announced that the area was now formally named the Wind Energy Area offshore New York. It also clarified that "[t]he goal of BOEM's Area Identification process is to identify the offshore locations that appear most suitable for wind energy development."

59. The Area Identification process, however, did not identify locations other than the NY WEA, much less compare which ones were most suitable for development, during the Area Identification process.

60. The March 16, 2016, announcement also obliquely stated that "BOEM is not considering, and the EA will not support, any decisions regarding the construction and operation of a wind energy facility."

61. BOEM published a "Proposed Sale Notice ("PSN")" for Commercial Leasing for Wind Power on the Outer Continental Shelf Offshore New York" in the Federal Register on June 6, 2016, which included a 60-day public comment period ending on August 5, 2016. 81 Fed. Reg. 36336 (June 6, 2016).

---

[1] *Available at* https://www.boem.gov/NY-Area-ID-Announcement/.

62.     BOEM also published an EA for a 30-day public comment period on June 6, 2016. 81 Fed. Reg. 36344 (June 6, 2016). In response to requests from FSF and other groups, BOEM extended the public comment until July 13, 2016.

63.     Despite receiving a large number of comments detailing conflicts in the area and urging re-siting of the NY WEA, on October 31, 2016, BOEM published a Final Sale Notice ("FSN") for a lease sale offshore New York. 81 Fed. Reg. 75429 (Oct. 31, 2016). It concurrently published its revised EA, which resulted in a Finding of No Significant Impact for commercial wind lease issuance and related activities within the lease area offshore New York. 81 Fed. Reg. 75438 (Oct. 31, 2016).

64.     The FSN represents agency action that is judicially reviewable under the APA and OCSLA, 43 U.S.C. § 1349.

### B.     Stakeholder Consultation and Solicitation of Input

65.     The EA states that "BOEM reduces its impacts early in the planning process by conducting site identification through public stakeholder meetings to avoid areas that may have significant impacts on the environment, including marine mammals." EA at 5-26. While BOEM met with various stakeholder groups before issuing the Final Sale Notice, these groups' input was merely collected (to a limited extent, anyway), but never analyzed nor meaningfully considered.

66.     BOEM's version of "Area Identification" for the NY WEA consisted of hosting public meetings in New York and New Jersey in November 2015—more than one year after its Call for Information regarding the NY WEA. In these meetings and in the EA, BOEM never solicited, presented, nor considered alternative sites for a wind energy lease.

67.     Fisheries Survival Fund representatives met repeatedly with BOEM and submitted comprehensive written comment letters detailing the impacts a wind energy lease in the NY WEA would have to the Atlantic scallop fishery and the environment.

68.     Squid industry representatives, including Plaintiffs Seafreeze, Sea Fresh USA, and the Town Dock, also held meetings and submitted written comments to BOEM, as well as providing extensive documentation of the importance of the NY WEA to the squid resource and fishery.

69.     GSSA, LICFA, RIFA, and Point Pleasant Co-Op also commented in writing and orally at BOEM-convened meetings and conference calls.

70.     At no point during the process has BOEM considered alternative sites for the wind energy project.

C.      **Environmental Assessment Deficiencies**

71.     The EA purports to analyze the effects of two actions: (1) site assessment and characterization for a future wind facility on Cholera Bank; and (2) issuance of a wind lease for such a facility. However, every aspect of the EA's analysis considers only the first of these two actions. It entirely lacks analysis regarding the biological, economic, social, and cultural impacts of lease issuance, as though breaking ground on a massive private enterprise is merely a ministerial event.

72.     BOEM states that it will continue to consult with stakeholder groups through the development of a wind energy facility by providing updates at federal fishery management council meetings, and that it will "also continue to *collect, verify, and validate* data regarding fisheries usage of the area as it become [sic] available." EA at 5-11 (emphasis added).

Collecting, verifying, and validating information does not constitute advance consultation—or even consultation at all—but instead merely furthers a set-in-stone siting decision.

73.     The U.S. Coast Guard ("USCG") submitted comments on the Draft EA stating, in part, that its "primary concern continues to be whether this proposal ensures sufficient sea room for vessels to transit and maneuver, especially in the case of an emergency." In accordance with its recently-issued Marine Planning Guidelines ("MPG"), the USCG has recommended a minimum setback for structure of 2 nm from all traffic lanes, and 5 nm from all entry and exit points to traffic lanes. The Maritime Association of the Port of New York/New Jersey, the World Shipping Council, and fishing industry groups—which have extensive experience with vessel navigation—submitted comments in support of the USCG recommendations. EA at 5-30.

74.     BOEM chose to ignore this advice from the nation's leading maritime safety experts, instead siding with environmentally-focused non-governmental agencies in choosing a preferred alternative that does not include the necessary buffers. It stated that these groups raised concerns that the MPG may be based on "outdated" guidance from the United Kingdom, and therefore it will not implement the USCG recommendations. Rather, it opted to consider "additional site-specific measures to mitigate navigational concerns, which could become terms and conditions of SAP approval" at an undetermined time in the future. *Id.*

75.     Furthermore, with regard to navigation, the EA states that "BOEM will continue to consult with USCG as the leasing process progresses, and intends to hold future navigational safety discussions with maritime community, fishing industry, and offshore wind energy industry [sic]." Given that it already flatly rejected USCG safety recommendations, it is difficult to determine how these future discussions will constitute effective consultation.

76.     The EA states that BOEM does not need to conduct an earnest review under NEPA of the impacts of building and operating a windfarm until a lessee submits a construction and operations plan ("COP"), years after lease issuance and after millions have been spent on site assessment and developing the COP. BOEM further takes the position in its responses to comments on the Draft EA that the formal scoping period, which is required to "determining the scope of issues to be addressed and for identifying the significant issues related to a proposed action," 40 C.F.R § 1501.7, will not occur until after it receives a completed COP. At that point, it will purportedly "host[] public scoping meetings to verify environmental and socio-economic information, and to gather additional input on issues, alternatives, and mitigation measures to be considered." EA at 5-12.

77.     The EA lacks analysis of the cumulative environmental effects of issuing multiple wind energy leases throughout the Atlantic. Critically, it also does not include the eventual construction of a wind energy facility as among the reasonably foreseeable impacts of completing a lease sale. While it concludes that the cumulative impacts of past, present, and reasonably foreseeable future federal activities will be "negligible to moderate," this conclusion is disingenuous and poorly supported.

78.     In addition to overlapping key fishing grounds, development of a wind energy facility would negatively impact other sensitive characteristics of the environment in the NY WEA. The area encompasses essential fish habitat for more than 35 federally-managed fish species including Atlantic cod, yellowtail flounder, bluefin tuna, and several skate and shark species. Federally-endangered species including humpback, and fin whales, Atlantic sturgeon, and several sea turtle species use the area for migration or feeding. The NY WEA, moreover, is located within a seasonal management area for the critically endangered North Atlantic right

whale. It is also an important migratory area for numerous bird and bat species. A wind farm would impact all of these species. BOEM did not consider impacts of a wind energy facility to these components of the environment any more than it considered impacts to fisheries.

79. Even specific to the SAP, the National Marine Fisheries Service cautioned BOEM in comments that "Cholera Bank is a structurally complex habitat that provides important functional value to fish as shelter and refuge from predators... complex benthic substrates are vulnerable to disturbance, particularly due to extended recovery times." EA at 5-17.

80. In response, BOEM removed five tiny aliquots from the leasing area, but otherwise found that the presence of EFH did not merit further consideration at this stage, since "the overall availability of benthic habitats to marine fauna ... is largely unchanged across southern New England and the Mid-Atlantic Bight, when considering past, present, and reasonably foreseeable future actions." EA at 5-17-5-18.

81. In addition to failing to consider foreseeable impacts associated with the actual development of a wind energy facility, the EA does not include the best available information on human uses and the environment in the proposed lease area for even the activities it purports to analyze. In the section of the EA that describes the affected environment in the NY WEA, BOEM did add (but did not analyze) some information to the Revised EA to include additional fishery stocks and more recent data on the squid and scallop resources than were in the original draft. However, it still excluded valuable information that was provided directly by the industry. For instance, squid fishery participants willingly disclosed vessel logbook information to show that BOEM grossly underestimated the amount of fishing effort occurring in the area. BOEM chose not to include the information in the EA, incorrectly stating that it was confidential. EA at 5-15.

**Complaint**                                    Page 21

82.     BOEM relied on the Mid-Atlantic Ocean Data Portal to describe the affected environment of the proposed lease area, and referenced that information as "the best available science." EA at 5-18. This characterization misused the Data Portal, which was not intended as an analytical tool. The Mid-Atlantic Regional Planning Body, of which BOEM is a member, developed the Data Portal as part of its Mid-Atlantic Ocean Action Plan ("OAP"). The OAP bluntly advises against using the portal for environmental determinations, stating: "[a]ll RPB member entities should use the Data Portal as an important, but non-exclusive, source of information to help identify potential conflicts, impacts, and potentially affected stakeholders …Accordingly, the Data Portal serves as a common data vocabulary or *starting point* for conversations between ocean resource managers and the applicants and stakeholders with whom they interact." OAP at 32-34 (emphasis added). Specific to ocean energy, the OAP states that the portal is intended as a "tool[] to assist in identifying the relevant species or locations *that may require further information*." OAP at 53 (emphasis added).

83.     The EA concluded that BOEM cannot evaluate the impacts of several activities associated with the lease issuance and SAP, because those impacts will depends on the SAP's details. This has the effect of authorizing activities that are exempt from public environmental review. It also improperly places analyses that are the responsibility of the government in the hands of private parties. The following five paragraphs provide examples:

84.     With regard to the variability of scallop densities within the proposed lease area, BOEM concluded that it is unnecessary to analyze an alternative that excludes high-density areas from leasing because "BOEM will review a lessee's SAP and may impose terms and conditions, as necessary, to minimize or avoid impacts to fishery resources." EA at 5-9.

85.     BOEM stated that it will require the lessee to develop a Fisheries Communication Plan ("FCP"). "BOEM hopes that this requirement [of creating a Fisheries Communication Plan] will encourage the lessee to consider their fisheries outreach strategy at an early stage of project development, and result in fisheries concerns being addressed in the lessee's survey plans, construction plans, and project design." (emphasis added). EA at 5-12.

86.     BOEM relied on guidelines it provides developers in assessing abundance, distribution, and impacts to marine mammals and sea turtles. These guidelines encourage the developer to conduct important surveys and other information to assess impacts, but BOEM does not require specific impact thresholds. EA at 5-26.

87.     The EA similarly failed to analyze impacts to birds. In response to many comments highlighting deficient information on vulnerable bird species, it concludes that "[n]o other updates to the EA are needed, because these concerns are currently addressed in the current Avian Guidelines... and text will be added to the updated guidelines to further emphasize this point, which will be released later this year." It also states that "... BOEM acknowledges the preference for a meteorological tower over buoys; however, BOEM does not specify the type of technology to be used by the developer." EA at 5-20.

88.     Despite the well-documented conflicts that fishery representatives provided to BOEM, the EA concluded that an alternative to remove certain areas of high fishery use from consideration was unreasonable, citing "the short duration and limited scope of the proposed action, the mobile nature of commercial fishing, and the minor anticipated impacts." EA at 5-9. Although BOEM reduced the lease area by 2% due to sensitive bottom habitat associated with Cholera Bank, which had the effect of reducing overlap with the squid fishery by 7%, "...this reduction was not made in response to fisheries impacts concerns...." EA at 5-10.

89.     The EA concluded that the issuance of a wind energy lease will not have any ecosystem-level impacts, since the SAP activities will disturb less than one acre of the seafloor and the Northeast continental shelf ecosystem is much larger than one acre. EA at 5-18. This is a gross scientific mischaracterization.

90.     The EA did not consider alternative sites for the planned wind energy facility.

## PLAINTIFFS' CLAIMS FOR RELIEF

### COUNT ONE
### (NEPA, 42 U.S.C. § 4332, *via* the APA: Improper Segmentation and Failure to Analyze Foreseeable Impacts)

91.     Plaintiffs allege paragraphs 1 through 90 as if they were set forth in full herein.

92.     The APA provides the right of review to "[a]ny person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702.

93.     The APA proscribes agency action that is

> (A) arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [or] (D) without observance of procedure required by law . . . .

5 U.S.C. § 706(c).

94.     "An agency's primary duty under the NEPA is to take a 'hard look' at environmental consequences" of the federal action. *Pub. Utils. Comm'n v. FERC*, 900 F.2d 269, 282 (D.C. Cir. 1990) (quoting *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21 (1976)) (internal quotes omitted).

95.     The "hard look" requirement confers on an agency the obligation to "look beyond the decision to offer a lease and consider the predictable consequences of that decision." *Public Employees for Envt'l Responsibility v. Hopper*, 827 F. 3d 1077, 1083 (D.C. Cir. 2016) (internal

citations omitted). *See also id.* at 1081 (an agency must "consider every significant aspect of the environmental impact of a proposed action.") (quoting *Balt. Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 97 (1983); citing 42 U.S.C. § 4332).

96.     "[A]n agency is required to consider more than one action in a single [environmental review document] if they are 'connected actions,' 'cumulative actions,' or 'similar actions.'" *Kleppe v. Sierra Club*, 427 U.S. 390, 408 (1976).   Thus, in conducting its NEPA analysis, an agency cannot "segment" its "NEPA review [by] divid[ing] connected, cumulative, or similar federal actions into separate projects and thereby fail[ing] to address the true scope and impact of the activities that should be under consideration." *Delaware Riverkeeper Network v. FERC*, 753 F. 3d 1304, 1313 (D.C. Cir. 2014).   An agency must consider "connected actions" within the same EA, which includes actions that are "interdependent parts of a larger action and depend on the larger action for their justification." *Id.* at 1314 (citing 40 C.F.R. § 1508.25).

97.     BOEM violated NEPA by, among other reasons, failing to consider the foreseeable, likely impacts of a wind farm in the NY WEA on fisheries, ocean and benthic fish habitat, protected species, navigation, and others prior to issuing the FSN.

98.     BOEM violated NEPA by segmenting and limiting its NEPA analysis to its initial decision to offer a lease and (to some extent) the development of an SAP, rather than looking beyond the decision to offer a lease and consider the predictable consequences of its FSN, specifically the construction and operation of a wind farm in the NY WEA area.

99.     BOEM's actions in failing to comply with NEPA are arbitrary and capricious, an abuse of discretion, and contrary to law, in violation of the APA.   5 U.S.C. § 706

100.    BOEM's actions have injured, and continue to injure, Plaintiffs in the manner described herein.

## COUNT TWO
### (NEPA, 42 U.S.C. § 4332, *via* the APA: Failure to Consider Alternative Sites)

101.    Plaintiffs allege paragraphs 1 through 100 as if they were set forth in full herein.

102.    An agency's EA (or EIS) is required to "discuss the need for the proposal, the alternatives, and the environmental impacts of the proposed action and the alternatives." *Center for Food Safety v. Salazar*, 898 F. Supp. 2d 130, 142 (D.D.C. 2012).

103.    BOEM violated NEPA by, among other reasons, failing to consider reasonable alternative sites for the wind farm project before publishing the FSN.

104.    BOEM's actions in failing to comply with NEPA are arbitrary and capricious, an abuse of discretion, and contrary to law, in violation of the APA. 5 U.S.C. § 706

105.    BOEM's actions have injured, and continue to injure, Plaintiffs in the manner described herein.

## COUNT THREE
### (NEPA, 42 U.S.C. § 4332, *via* the APA: Failure to Prepare Environmental Impact Statements)

106.    Plaintiffs allege paragraphs 1 through 105 as if they were set forth in full herein.

107.    NEPA requires federal agencies to prepare an EIS for "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C).

108.    The foreseeable impacts and cumulative effects of issuing the Lease constitute a major federal action.

109.    BOEM failed to perform an EIS when it published the FSN.

110.    BOEM's actions in failing to comply with NEPA are arbitrary and capricious, an abuse of discretion, and contrary to law, in violation of the APA. 5 U.S.C. § 706

111.    BOEM's actions have injured, and continue to injure, Plaintiffs in the manner described herein.

## COUNT FOUR
**(OCSLA, 43 U.S.C. § 1331, *et seq.*, *via* the APA and, Independently, the Citizen's Suit Provisions of the OCSLA, 43 U.S.C. § 1349: Failure to Consider Plaintiffs' Interests Prior to Issuing the FSN)**

112.    Plaintiffs allege paragraphs 1 through 111 as if they were set forth in full herein.

113.    The OCSLA imposes a legal obligation on the government to protect "safety," existing "natural resources" and any "reasonable uses," of a proposed lease area, and to consider areas for fishing and navigational purposes. 43 U.S.C. §§ 1337(p)(4)(I), (J).   The law further requires that "the character of the waters above the outer continental shelf as high seas and the right to navigation and fishing therein shall not be affected" by the leasing of OCS submerged lands. *Id.* § 1332(2).

114.    In *Massachusetts v. Andrus*, 594 F.2d 872, 891 (1st Cir. 1979), the Court held that the OCSLA imposes a duty to not "go forward with a lease sale in a particular area if it would create unreasonable risks [to fisheries] in spite of all feasible safeguards."

115.    BOEM did not protect "safety," existing "natural resources," and "reasonable uses" as the OCSLA requires, because, among other reasons, it proceeded with the FSN without considering the risk that a wind farm within the footprint chosen by the Consortium "would create unreasonable risks in spite of all feasible safeguards" to protected species habitat, living marine resources, and the ocean and benthic habitat.

116.    BOEM did not protect "safety," existing "natural resources," and "reasonable uses" as the OCSLA requires, because, among other reasons, it proceeded with the FSN without considering the risk that a wind farm within the footprint chosen by the Consortium "would create unreasonable risks in spite of all feasible safeguards" to the fisheries, including the

**Complaint**                          Page 27

significant navigational, safety, and environmental risks, and adverse economic, social, cultural, and environmental consequences.

117.    BOEM did not protect "safety," existing "natural resources," and "reasonable uses" as the OCSLA requires, because it proceeded with the FSN without considering the significant risks that activities authorized pursuant to the Lease pose to other natural resources and resource users in the NY WEA.

118.    BOEM's actions in failing to comply with the OCSLA are arbitrary and capricious, an abuse of discretion, and contrary to law, in violation of the APA and OCSLA.  5 U.S.C. § 706; 43 U.S.C. § 1349, *et seq.*

119.    BOEM's actions have injured, and continue to injure, Plaintiffs in the manner described herein.

## COUNT FIVE
**(OCSLA, 43 U.S.C. § 1331, *et seq.*, *via* the APA and, Independently, the Citizen's Suit Provisions of the OCSLA, 43 U.S.C. § 1349: Smart from the Start Violates the OCSLA's Requirement that BOEM Consider Impacts to the Fisheries Prior to Entering a Lease)**

120.    Plaintiffs allege paragraphs 1 through 119 as if they were set forth in full herein.

121.    Smart from the Start's unsolicited bid process violates the OCSLA because, among other reasons, it enables a private wind energy developer to select an ocean area for development without adequate public input in violation of protections for "safety," existing "natural resources," and "reasonable uses."

122.    BOEM's actions in failing to comply with the OCSLA are arbitrary and capricious, an abuse of discretion, and contrary to law, in violation of the APA and OCSLA.  5 U.S.C. § 706; 43 U.S.C. § 1349, *et seq.*

123.    BOEM's actions have injured, and continue to injure, Plaintiffs in the manner described herein.

## PRAYERS FOR RELIEF

WHEREFORE, Plaintiffs respectfully seek an Order of this Court:

(a)    Declaring, pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, that the FSN was promulgated in violation of the APA, NEPA, and the OCSLA for, among others, the reasons stated above;

(b)    Declaring, pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, that Defendants lack authority to enter the Lease without the proper EA or EIS evaluating (1) the foreseeable consequences of the wind farm on fisheries, ocean and benthic fish habitat, protected species, navigation, and others, and (2) alternative sites for the wind farm;

(c)    Declaring, pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, Defendants' issuance of the FSN, Smart from the Start, and the Lease itself, should it be entered, to be *ultra vires* and contrary to law;

(d)    Enjoining Defendants from entering the Lease;

(e)    Enjoining Defendants from accepting submissions for wind leases under Smart from the Start;

(f)    Vacating and remanding the FSN and Smart from the Start;

(g)    Remanding the FSN to BOEM to prepare a lawful environmental impact statement;

(h)    Should the Lease be entered, enjoining BOEM from considering any SAP submitted pursuant to the Lease until a lawful EA or EIS is performed;

(i)    Should the Lease be entered, vacating the Lease as unlawful;

(j)    Awarding Plaintiffs their costs and attorneys' fees as appropriate;

(k)    Providing such other relief as is just and proper.

Dated: December 7, 2016

Respectfully submitted,

David E. Frulla
D.C. Bar No. 414170
Andrew E. Minkiewicz
D.C. Bar No. 981552
Elizabeth C. Johnson
D.C. Bar No. 987429

Kelley Drye & Warren LLP
3050 K Street, N.W.  – Suite 400
Washington, D.C.  20007
Telephone: (202) 342-8400
Facsimile: (202) 342-8451
dfrulla@kelleydrye.com
aminkiewicz@kelleydrye.com
ejohnson@kelleydrye.com

*Attorneys for Plaintiffs*