# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| FISHERIES SURVIVAL FUND, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 16-cv-2409 (TSC) |
| | ) | |
| SALLY JEWELL, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

This case concerns a Bureau of Ocean Energy Management ("BOEM") plan to lease a nautical area off the coast of New York to Defendant-Intervenor Statoil Wind US, LLC ("Statoil"), for development of a wind energy facility. Plaintiffs[1], including the Fisheries Survival Fund, claim that in issuing the lease, BOEM violated the National Environmental Policy Act ("NEPA"), the Outer Continental Shelf Lands Act ("OCSLA"), and the Administrative Procedure Act ("APA"). Plaintiffs filed a motion for preliminary injunction, which this court denied. Memorandum Opinion, ECF No. 26. Now before the court are Plaintiffs' Motion for Summary Judgment, ECF No. 39, Defendant-Intervenor's Cross-Motion for Summary Judgment, ECF No. 40, and Defendants' Motion for Summary Judgment, ECF No. 42. For the reasons stated herein, Plaintiffs' motion will be DENIED, Defendants' motion will be GRANTED, and Defendant-Intervenor's motion will be DENIED as moot.

---

[1] The other Plaintiffs are: Borough of Barnegat Light, NJ; the Town Dock; Seafreeze Shoreside; Sea Fresh USA; Rhode Island Fishermen's Alliance; Garden State Seafood Association; Long Island Commercial Fishing Association; the Town of Narragansett, RI; the Narragansett Chamber of Commerce; the City of New Bedford, MA; and the Fishermen's Dock Co-Operative of Point Pleasant.

# I.     BACKGROUND

## A.  Statutory & Regulatory Framework

### 1. OCSLA

As amended by the Energy Policy Act of 2005, Pub. L. 109-58, 119 Stat. 594 (2005), OCSLA authorizes BOEM to issue leases, easements, or rights-of-way for offshore renewable energy projects.  43 U.S.C. § 1337(p)(1)(C).  In exercising this authority, BOEM is required to consult with the U.S. Coast Guard and other relevant federal agencies, and must consider several factors that include, *inter alia*, safety, protection of the environment, prevention of waste, conservation of natural resources, national security interests, and—critically—"the location of . . . a lease. . . for an area of the outer Continental Shelf" and "any other use of the sea or seabed, including use for a fishery, a sealane, a potential site of a deepwater port, or navigation."  *Id.* § 1337(p)(4)(A)–(L) & (J)(i)–(ii).

### 2. NEPA

NEPA was enacted to establish "a national policy [to] encourage productive and enjoyable harmony between man and his environment," to "prevent or eliminate damage to the environment," and "to enrich the understanding of the ecological systems and natural resources important to the Nation."  42 U.S.C. § 4321; *see also Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 756–57 (2004).  NEPA serves these goals by imposing "procedural requirements on federal agencies with a particular focus on requiring agencies to undertake analyses of the environmental impact of their proposals and actions."  *Pub. Citizen*, 541 U.S. at 756–57; *Theodore Roosevelt Conservation P'ship v. Salazar*, 616 F.3d 497, 503 (D.C. Cir. 2010) (noting that "[NEPA] is an 'essentially procedural' statute, meant to ensure 'a fully informed and well-considered decision, not necessarily' the best decision") (quoting *Vermont Yankee Nuclear Power Corp. v. Natural*

*Res. Def. Council, Inc.*, 435 U.S. 519, 558 (1978)). The statute requires that the relevant agency (1) "consider every significant aspect of the environmental impact of a proposed action," *Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 97 (1983) (quoting *Vermont Yankee*, 435 U.S. at 553), and (2) "inform the public that the agency has considered environmental concerns in its decisionmaking process." *Weinberger v. Catholic Action of Hawaii/Peace Educ. Project*, 454 U.S. 139, 143 (1981).

"NEPA requires that when an agency proposes a 'major Federal action[] significantly affecting the quality of the human environment,' the agency must prepare and circulate for public review and comment an environmental impact statement ("EIS") that examines the environmental impact of the proposed action and compares the action to other alternatives." *Theodore Roosevelt Conservation P'ship*, 616 F.3d at 503 (quoting 42 U.S.C. § 4332(2)(C)); *see also Sierra Club v. Van Antwerp*, 661 F.3d 1147, 1153 (D.C. Cir. 2011). Nevertheless, an EIS is not always necessary. *See Public Citizen v. NHTSA*, 848 F.2d 256, 265 (1988) ("NEPA requires the preparation of a complete EIS for 'major federal actions *significantly* affecting the quality of the human environment.'") (emphasis in original). Agencies may "prepare a more limited document"—known as an Environmental Assessment ("EA")—if a proposed action is neither categorically excluded from the EIS requirement nor of the kind that would normally require an EIS. *See* 40 C.F.R. §§ 1501.4(a)–(b); *Pub. Citizen*, 541 U.S. at 757 ("CEQ regulations allow an agency to prepare . . . an [EA] . . . if the agency's proposed action neither is categorically excluded from the requirement to produce an EIS nor would clearly require the production of an EIS."). An EA is a "concise public document" intended to "[b]riefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact." 40 C.F.R. §§ 1508.9(a)(1); *Pub. Citizen*, 541 U.S. at 757–58. Where

preparation of an EA leads an agency to decide that an EIS is unnecessary, the agency is required to issue a "finding of no significant impact"—"a document . . . briefly presenting the reasons why an action . . . will not have a significant effect on the human environment and for which an environmental impact statement will therefore not be prepared." 40 C.F. R. §§ 1501.4(e), 1508.13.

**B. BOEM's Leasing Process**

In accordance with OCSLA, BOEM promulgated a series of regulations governing the leasing and management of offshore renewable energy projects. *See* 30 C.F.R. § 585.200–234. Pursuant to these regulations, the commercial leasing process may be initiated by both solicited and unsolicited applications. A solicited application is one in which BOEM itself identifies the potential development site and initiates the leasing process by publishing a notice of Request for Interest ("RFI") or a Call for Information and Nominations in the Federal Register. *See* 30 C.F.R. §§ 585.210, 585.211(a). An unsolicited application is one in which a potential developer applies for a site not otherwise under consideration by BOEM. *See* 30 C.F.R. § 585.230.

Upon receiving an unsolicited request, BOEM publishes a RFI to seek public comment and determine whether there is competitive interest from other developers. *Id.* § 585.231(b). If there is competitive interest, BOEM proceeds with the competitive process. *Id.* § 585.231(c)(1). Otherwise, it publishes a notice of Determination of No Competitive Interest and follows a separate procedure. *Id.* § 585.231(d)–(i). Regardless of the procedure adopted in any case, BOEM must consult throughout the leasing process with state task forces, other state and local representatives, and with representatives of Indian Tribes whose interests may be affected. *Id.* §§ 585.102(e), 585.211(a)–(d), 585.231(e).

Before issuing a lease, BOEM follows a four-step procedure, issuing a Call for Information and Nominations, completing the Area Identification process, publishing a Proposed Sale Notice, and publishing a Final Sale Notice. *Id.* § 585.211(a)–(d). Once BOEM has issued a lease, the lessee must submit a Site Assessment Plan for review before any assessment activity takes place. *Id.* §§ 585.601, 585.605. Even after completing a site assessment, a lessee may not begin construction until it has submitted, and BOEM has approved, a Construction and Operations Plan. *Id.* § 585.620(c). BOEM can accept, reject, or accept with modifications a lessee's Site Assessment or Construction and Operations Plan, *id.* §§ 585.613, 585.628, and must analyze the potential environmental impacts of the plans. *See id.* §§ 585.613, 585.620(c).

## C. Lease OCS–A 0512

In September 2011, a consortium of energy companies consisting of the New York Power Authority, Long Island Power Authority, and Consolidated Edison (collectively, "the Consortium"), proposed developing a wind energy facility covering approximately 81,500 acres of ocean off the coast of New York. NYAR-0074853, 0074854. Due to safety concerns about shipping lanes, the Consortium later amended the request to cover 81,130 acres, or about 127 square miles. NYAR-0074140. The Consortium claims the proposed project has "the potential to be the largest offshore wind energy facility in the United States." NYAR-0074853. Since the Consortium's request was unsolicited, BOEM initiated an RFI on January 4, 2013 to gauge other companies' interest in developing the area. 78 Fed. Reg. 760-02 (Jan. 4, 2013). The RFI also requested that "interested and affected parties comment and provide information about site conditions and multiple uses within the area identified in this notice that would be relevant to the proposed project or its impacts." *Id.* at 760 –61.

After reviewing nominations of interest and acknowledging competitive interest in the area, BOEM initiated the competitive leasing process. Compl. ¶ 54. On May 28, 2014, BOEM published (1) a Notice of Intent to prepare an EA and (2) a Call for Information and Nominations from companies interested in commercial wind energy leases in the proposed wind farm area. 79 Fed. Reg. 30,643–44 (May 28, 2014); 79 Fed. Reg. 30,645. BOEM also began the "Area Identification" process to "identify offshore locations that appear most suitable for wind energy development" and "designat[e] . . . an area with the greatest wind resource potential, minimal environmental and space use conflict, and possible alternatives for environmental analysis." NYAR-0044172; 30 C.F.R. § 585.211(b). BOEM completed this process on March 14, 2016, thereby marking the area as available for lease. *See* NYAR-0045776.

On June 6, 2016, BOEM published a "Proposed Sale Notice for Commercial Leasing for Wind Power on the Outer Continental Shelf Offshore New York" in the Federal Register. 81 Fed. Reg. 36,336 (June 6, 2016) (NYAR-0047230). The Proposed Sale Notice included a sixty-day comment period, which closed on August 6, 2016. *Id.* On June 6, BOEM also published an EA, along with a Notice of Availability for a thirty-day public comment period. 81 Fed. Reg. 36,344 (June 6, 2016) (NYAR-0047238). According to the Notice of Availability, the EA focused on assessing the potential impact of and reasonable alternatives to "commercial wind lease issuance, site characterization activities (geophysical, geotechnical, archaeological, and biological surveys) and site assessment activities (including the installation and operation of a meteorological tower and/or buoys)." *Id.* The Notice also stated that "[s]hould a lessee propose to construct a commercial wind facility through submission of a [Construction and Operations Plan], BOEM would conduct a separate site and project-specific [NEPA] analysis, likely an [EIS], and would provide additional opportunities for public involvement . . . ." *Id.* After

requests from Plaintiff Fisheries Survival Fund and other groups, BOEM extended the public comment period to July 13, 2016. Compl. ¶ 62.

On October 31, 2016, BOEM published the Final Sale Notice for the lease sale of the area. 81 Fed. Reg. 75,429 (Oct. 31, 2016) (NYAR-0075588). BOEM determined that fourteen different bidders were "legally, technically, and financially qualified to hold a commercial wind lease" and to bid in the auction. *Id.* at 75,430 (NYAR-0075589). BOEM also published its revised EA, which found no significant impact for commercial wind lease issuance and related activities within the area. 81 Fed. Reg. 75,438 (Oct. 31, 2016). The finding of no significant impact concluded that "the reasonably foreseeable environmental impacts . . . would not significantly impact the quality of the human environment," and "therefore, the preparation of an environmental impact statement [was] not required." *Id.*; *see also* NYAR-0074241. The EA stated that "BOEM reduces its impacts early in the planning process by conducting site identification through public stakeholder meetings to avoid areas that may have significant impacts on the environment, including marine mammals." NYAR-0074521.

On December 15 and 16, BOEM held a lease auction, which Statoil won with a $42,469,725 bid. *See* Commercial Lease of Submerged Lands for Renewable Energy Development on Continental Shelf (NYAR-0046753). BOEM and Statoil executed the lease on March 15, 2017. NYAR-0046759. The lease grants Statoil the exclusive right to conduct site characterization activities and, within one year of lease issuance, to propose a Site Assessment Plan. NYAR-0046753; 30 C.F.R. §§ 585.601, 585.605. If BOEM approves the Plan, Statoil will have five years to engage in site assessment—including conducting surveys and using towers or buoys to evaluate wind resources—and propose a Construction and Operations Plan, 30 C.F.R. §§ 585.235(a)(2), 585.601(b), which must include detailed data and information to support the

plan for the wind facility, and proposals for minimizing environmental impact. 30 C.F.R. §
585.626(b). BOEM would then conduct "an appropriate NEPA analysis" based on the
information included in the Construction and Operations Plan, before deciding whether to
approve the Plan. 30 C.F.R. § 585.628(b).

## II. LEGAL STANDARD

The APA requires courts to "set aside any agency action that is 'arbitrary and capricious,
an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). In
assessing a summary judgment motion brought under the APA, courts are "not empowered to
substitute [their] judgment for that of the agency." *Beyond Nuclear v. U.S Dep't of Energy*, 233
F. Supp. 3d 40, 47 (D.D.C. 2017) (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401
U.S. 402, 416 (1971)). Rather, the court's role is to "determine whether or not as a matter of law
the evidence in the administrative record permitted the agency to make the decision it did." *Coe
v. McHugh*, 968 F. Supp. 2d 237, 239–40 (D.D.C. 2013) (quoting *Occidental Eng'g Co. v. INS*,
753 F.2d 766, 769–70 (9th Cir. 1985)).

Generally, an agency action is arbitrary if:

the agency has relied on factors which Congress has not intended it to consider,
entirely failed to consider an important aspect of the problem, offered an
explanation for its decision that runs counter to the evidence before the agency, or
is so implausible that it could not be ascribed to a difference in view or the product
of agency expertise.

*Delaware Riverkeeper Network v. FERC*, 753 F.3d 1304, 1313 (D.C. Cir. 2014) (quoting *Motor
Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983)). This
standard also applies when assessing compliance with NEPA and the adequacy of an EIS. *City of
Olmsted Falls, OH v. FAA*, 292 F.3d 261, 269 (D.C. Cir. 2002) (citing *Marsh v. Oregon Natural
Resources Council*, 490 U.S. 360, 376 (1989)). "Courts may not use their review of an agency's

environmental analysis to second-guess substantive decisions committed to the discretion of the agency," *Del. Riverkeeper Network*, 753 F.3d at 1313, and must instead "review the EIS to 'ensure that the agency took a "hard look" at the environmental consequences of its decision to go forward with the project.'" *Olmsted Falls*, 292 F.3d at 269 (quoting *City of Grapevine, Tex. v. DOT*, 17 F.3d 1502, 1503–04 (D.C. Cir. 1994)).

## III. DISCUSSION

The parties' motions for summary judgment present two broad issues: (1) whether Defendants violated NEPA by improperly segmenting their NEPA analysis, failing to consider a reasonable range of alternatives, and failing to prepare an EIS in deciding the site of the proposed wind farm area; and (2) whether Defendants violated their obligations under OCSLA by failing to consider a number of relevant factors in the site selection process, failing to consider those factors in proceeding with the lease sale, and/or acting in accordance with a regulatory procedure that exceeds the authority granted under OCSLA. Pls. Mot. Summ. J. at 38–47, 47–54, ECF No. 39-1; Def. Intervenors Mot. Summ. J. at 17–24, 24–32, ECF No. 40; Defs. Mot. Summ. J. at 29–44, 45–54, ECF No. 42. The parties also raise issues of standing and constitutional ripeness. *See, e.g.*, ECF No. 42 at 22–28. As these latter issues present jurisdictional questions, this court will address them at the threshold.

### A. Standing

Plaintiffs, who bear the burden of establishing standing, *see Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994), claim a procedural injury relating to BOEM's issuance of the lease. Plaintiffs contend that "the heart of [their] injury" results from BOEM's decision to issue the lease on key fishing grounds "prior to obtaining any public input or considering fishing, environmental, or safety interests with respect to the physical boundaries of

that area," in violation of NEPA and OCSLA. ECF No. 39-1 at 37. Plaintiffs further allege that they will be injured by the "exploration and development of a wind farm" in the area that will likely follow from issuance of the lease and "directly damage the natural resources in that area, . . . physically preclude . . . fisheries from operating fishing vessels in that area, . . . [and] pose navigational safety issues." ECF No. 39-1 at 37.

Defendants respond that Plaintiffs' allegations of harm do not establish standing "because they all relate to the possible future approval of the construction of a wind energy facility," rather than "the site characterization and site assessment activities associated with issuance of the lease." Defs. Opp'n Mot. at 23, ECF No. 43. According to Defendants, Plaintiffs' alleged future injuries "fail to demonstrate that the construction of a wind energy facility is *substantially probable*," ECF No. 53 at 3 (emphasis in original), insofar as the construction depends on future events—including the preparation and approval of multiple reports and a development plan— that have not occurred and may not occur for six years, if at all. ECF No. 43 at 24.

Standing is a jurisdictional prerequisite—an "irreducible constitutional minimum" that requires a plaintiff to show: (1) an "injury in fact" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical"; (2) that the injury is "fairly traceable to the challenged action of the defendant"; and (3) that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Chamber of Commerce of U.S. v. E.P.A.*, 642 F.3d 192, 200 (D.C. Cir. 2011) (quoting *Bennett v. Spear*, 520 U.S. 154, 167 (1997)); *Summers v. Earth Island Inst.*, 555 U.S. 488, 492 (2009) (noting that standing doctrine "requires federal courts to satisfy themselves that 'the plaintiff has alleged such a personal stake in the outcome of the controversy' as to warrant his invocation of federal-court jurisdiction.") (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975)).

When a party alleges injury to its procedural rights, "courts relax the normal standards of redressability and imminence." *Sierra Club v. Fed. Energy Regulatory Comm'n*, 827 F.3d 59, 65 (D.C. Cir. 2016). In such cases, "the primary focus of the standing inquiry is not the imminence or redressability of the injury to the plaintiff, but whether a plaintiff who has suffered a personal and particularized injury has sued a defendant who has caused that injury." *City of Dania Beach v. FAA*, 485 F.3d 1181, 1185 (D.C. Cir. 2007) (quoting *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 68, 664 (D.C. Cir. 1996) (en banc)). "To establish injury-in-fact in a 'procedural injury' case, petitioners must show that 'the government act performed without the procedure in question will cause a distinct risk to a particularized interest of the plaintiff.'" *Id.* at 1185 (quoting *Fla. Audubon Soc'y*, 94 F.3d at 663). In other words, "[a] violation of the procedural requirements of a statute is sufficient to grant a plaintiff standing to sue, so long as the procedural requirement was designed to protect some threatened concrete interest of the plaintiff." *City of Dania Beach*, 485 F.3d at 1185 (quoting *City of Waukesha v. EPA*, 320 F.3d 228, 234 (D.C. Cir. 2003)); *see also Sierra Club*, 827 F.3d at 65 ("[A]n adequate causal chain must contain at least two links: one connecting the omitted [NEPA analysis] to some substantive government decision that may have been wrongly decided because of the lack of [proper NEPA analysis] and one connecting that substantive decision to the plaintiff's particularized injury."). A plaintiff alleging a violation of some procedural right "never has to prove that if he had received the procedure the substantive result would have been altered," and need only show "that the procedural step was connected to the substantive result." *Sugar Cane Growers Cooperative v. Veneman*, 289 F.3d 89, 95 (D.C. Cir. 2002).

Plaintiffs are entitled to bring their OCSLA and NEPA claims under a procedural standing theory because they have demonstrated a threat to a sufficiently concrete and

particularized interest in the wind farm area, and the alleged procedural deficiencies are connected to a substantive governmental decision—issuing the lease—that is in turn connected to a risk of harm to Plaintiffs' identified interests. *See Dania Beach*, 485 F.3d at 1185 (describing need for distinct risk to particularized interest in procedural injury context); *Sierra Club*, 827 F.3d at 65 (discussing components of an adequate causal chain in procedural injury context). The Plaintiffs in this case include those who use or depend on the use of the wind farm area and the natural resources contained therein for fishing, navigation, and associated economic and recreational benefits. *See* ECF No. 39-1 at 15–17, 21–25. The use or enjoyment of wildlife is a cognizable interest for standing purposes, *see Ctr. for Biological Diversity v. U.S. Department of Interior*, 563 F.3d 466, 479 (D.C. Cir. 2009) ("*CBD*") (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 562–63 (1992)) (affirming the appropriateness of an interest in enjoyment of wildlife), and here, that interest is concrete and particularized insofar as it refers to specific marine species and activities within a distinct, identified area. *See Bentsen*, 94 F.3d at 667–68 (emphasizing need for particularization of alleged environmental interests in form of geographic nexus to claim of particularized injury). Furthermore, Plaintiffs claim—in multiple declarations—that their interest in the use or enjoyment of the area under the lease will be damaged or altogether precluded by development. *See, e.g.*, ECF No. 3-1 at 2–3, 5–9, 133–40, 115–16.

The court notes that the lease only authorizes site characterization and assessment, and that construction—the development phase involving the most transformative activity—has not yet received approval, and depends on multiple contingencies occurring over a six-year period. *See* ECF No. 43 at 24; ECF No. 53 at 11. Nevertheless, this fact does not render Plaintiffs' alleged injury too speculative or hypothetical for purposes of standing. The relevant injury here

is the injury that Plaintiffs allege regarding the development process as a whole, including the lease sale phase. While the lease itself may not authorize construction of the wind farm, it is undeniably a milestone in the lessee's plan to transform an area currently used for industrial and recreational fishing into an area that Plaintiffs allege is likely to be rendered unsuitable for such purposes. Although the lease does not dispel all contingencies associated with the project, it does increase the probability that any planned development will occur in the designated area. In other words, Plaintiffs have alleged a particularized threat to their concrete interest in use of the leased area insofar as their stated concern is the progress of a development project affecting that interest.

It also appears that the challenged leasing decision is causally connected to an increased risk of harm to Plaintiffs' particularized interests, insofar as the decision increases the risk to their enjoyment of the marine life in the area likely to be affected by the development. *See CBD*, 563 F.3d at 479 (approving procedural theory of standing because "adoption of an irrationally based Leasing Program could cause a substantial increase in the risk to [Petitioners'] enjoyment of the animals affected by the offshore drilling"); *see also* 827 F.3d at 65 (noting need to connect substantive decision that may have been wrongly decided to a particularized injury). For these reasons, Plaintiffs have successfully articulated a procedural theory of Article III standing.[2]

---

[2] While the analysis of the standing issue applies directly to the municipal plaintiffs, the associational plaintiffs must satisfy additional requirements. Organizations have standing to sue on behalf of their members if: "(1) at least one of [the organization's] members would have standing to sue in his or her own right; (2) 'the interests it seeks to protect are germane to the organization's purpose'; and (3) 'neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" *Sierra Club v. FERC*, 827 F.3d 59, 65 (D.C. Cir. 2016) (quoting *WildEarth Guardians v. Jewell*, 738 F.3d 298, 305 (D.C. Cir. 2013)). Here, the associational plaintiffs have standing to sue on behalf of their members, whose declarations demonstrate that they share the interest and injury identified above. *See, e.g.*, ECF No. 3-1 at 1–5, 133–40, 115–16. Moreover, the associational plaintiffs' organizational purposes—broadly, to promote the interests of Atlantic fishermen—plainly relate to the fishing industry and commercial

**B. Ripeness of NEPA Claims**

Plaintiffs contend that their NEPA[3] claims are ripe because "the Lease precludes any further action for the most critical stage of the leasing process—project siting—and constitutes an irretrievable commitment of resources," the key trigger for an agency's NEPA obligations. Pls. Opp. to Def. & Def. Intervenor Mot. at 23, ECF No. 48. Defendants argue that the NEPA claims are not ripe because they "allege that BOEM failed to properly analyze the environmental impacts of constructing and operating a wind energy facility," even though BOEM has yet to approve the construction or operation of such a facility. ECF No. 43 at 25.

The ripeness doctrine is related to standing, and requires that a litigant's claims be "constitutionally and prudentially ripe," so as to protect (1) "the agency's interest in crystallizing its policy before that policy is subjected to judicial review," (2) "the court's interests in avoiding unnecessary adjudication and in deciding issues in a concrete setting," and (3) "the petitioner's interest in prompt consideration of allegedly unlawful agency action." *Nevada v. Department of Energy*, 457 F.3d 78, 84 (D.C. Cir. 2006) (quoting *Eagle–Picher Indus., Inc. v. EPA*, 759 F.2d 905, 915 (D.C. Cir. 1985)). In "determining whether a dispute is ripe for review, courts consider 'both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.'" *Am. Tort Reform Ass'n v. Occupational Safety & Health Admin.*, 738 F.3d 387, 396 (D.C. Cir. 2013) (quoting *Abbott Laboratories v. Gardner*, 387 U.S. 136, 149 (1967)).

---

or recreational fishing. *See* ECF No. 39 at 2, 34 (describing plaintiffs and organizational purpose); *Ctr. for Sustainable Economy v. Jewell*, 779 F.3d 588, 597 (D.C. Cir. 2015) ("*CSE*") ("The germaneness requirement [of associational standing] mandates 'pertinence between litigation subject and organizational purpose.'") (quoting *Humane Soc. of the United States v. Hodel*, 840 F.2d 45, 58 (D.C. Cir. 1988)).

[3] Plaintiffs' OCSLA claims "concern OCSLA requirements that are implicated at the initial stage of a leasing program," and are therefore ripe. *CBD*, 563 F.3d at 484.

Courts must also consider: "(1) whether delayed review would cause hardship to the plaintiffs; (2) whether judicial intervention would inappropriately interfere with further administrative action; and (3) whether the courts would benefit from further factual development of the issues presented." *Nevada*, 457 F.3d at 84 (quoting *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 733 (1998)). Typically, "[a] claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Nevada*, 457 F.3d at 85 (quoting *Texas v. United States*, 523 U.S. 296, 300 (1998)).

An agency's NEPA obligations mature "only once it reaches a 'critical stage of a decision which will result in irreversible and irretrievable commitments of resources to an action that will affect the environment.'" *CBD*, 563 F.3d at 480 (quoting *Wyoming Outdoor Council v. United States Forest Service*, 165 F.3d 43, 49 (D.C. Cir. 1999) ("*Wyo. Outdoor Council II*")). Cases involving multiple-stage leasing programs—arising in the oil and gas context—indicate that an agency reaches this critical stage when it "no longer retain[s] the authority to preclude all surface disturbing activities subsequent to issuing an oil and gas lease," such that "an EIS assessing the full environmental consequences of leasing must be prepared before commitment to any actions that might affect the quality of the human environment." *Wyo. Outdoor Council II*, 165 F.3d at 49 (alteration in original) (quoting *Sierra Club v. Peterson*, 717 F.2d 1409, 1415 (D.C. Cir. 1983)); *see also Conner v. Burford*, 848 F.2d 1441, 1451 (9th Cir. 1988) ("[U]nless surface-disturbing activities may be absolutely precluded, the government must complete an EIS before it makes an irretrievable commitment of resources . . . ."). In other words, lease issuance triggers

NEPA obligations unless the issuing agency "retain[s] the authority to preclude all surface disturbing activities." *Wyo. Outdoor Council II*, 165 F.3d at 49.[4]

Though the parties agree that the above legal standard is appropriate, they disagree on how it should be applied. Plaintiffs contend that to avoid making an irreversible commitment of resources, the agency making a lease sale must unilaterally retain "the *absolute right* to prevent *all* surface-disturbing activity." ECF No. 48 at 22 (quoting *Conner*, 848 F.2d at 1449) (emphasis in original). They argue that BOEM does not retain the absolute right because its ability to cancel a lease is limited by lease criteria and Statoil's regulatory compliance. ECF No. 48 at 11–12. Defendants respond that the lease language establishes BOEM's absolute authority to preclude activity in the leased area, that Plaintiffs misunderstand the applicable legal standard in contending otherwise, and that "because BOEM retains the authority to deny a [Construction and Operations Plan], the issuance of the lease to Statoil was not an irreversible and irretrievable commitment of resources." ECF No. 53 at 14, 15. In the court's view, the applicable regulations and the terms of the lease preclude Statoil from engaging in any construction activities, and vest complete authority in BOEM to preclude such activity in the leased area before the Construction and Operations Plan is approved. Therefore, issuing the lease does not constitute an irreversible and irretrievable commitment of resources. *See Wyo. Outdoor Council II*, 165 F.3d at 49. Accordingly, Plaintiffs' NEPA claims must be dismissed as unripe at this stage.

---

[4] Plaintiffs do not address ripeness in their memorandum in support of their motion for summary judgment. In their opposition to Defendants' motion, Plaintiffs appear to question in passing whether the standard in cases involving oil and gas leases should apply in the Outer Continental Shelf context or to renewable energy leases. ECF No. 48 at 19. Nevertheless, they do not offer any argument as to why the court should decline to apply that standard, and do not offer any alternative standard, instead opting to argue their position from within the oil and gas lease legal framework, which the court finds analogous and appropriate.

On its own, the lease at issue does no more than grant Statoil the exclusive right to submit a Site Assessment Plan and Construction and Operations Plan to BOEM for approval. NYAR-0046754. No activity is permitted absent the submission and approval of these plans, NYAR-0046754, and the lease provides that (1) "[the] lease does not, by itself, authorize any activity within the leased area," (2) "the Lessor will decide whether to approve a SAP or COP in accordance with the applicable regulations in 30 CFR Part 585," and (3) "the Lessor retains the right to disapprove a SAP or COP based on the Lessor's determination that the proposed activities would have unacceptable environmental consequences . . . ." NYAR-0046754. Moreover, BOEM regulations provide that a lease can be cancelled if, after "notice and opportunity for a hearing," BOEM determines that "continued activity under the lease or grant":

    (i)      Would cause serious harm or damage to natural resources; life (including human and wildlife); property; the marine, coastal, or human environment; or sites, structures, or objects of historical or archaeological significance; and

    (ii)    That the threat of harm or damage would not disappear or decrease to an acceptable extent within a reasonable period of time; and

    (iii)   The advantages of cancellation outweigh the advantages of continuing the lease or grant in force.

30 C.F.R. § 585.437(b)(4)(i)–(iii).

The thrust of Plaintiffs' first argument is that BOEM's authority to preclude activity in the wind farm area cannot be absolute if it is subject to conditions, and that the criteria set forth above are conditions. Thus, Plaintiffs argue, the lease represents a commitment of resources, and therefore their NEPA claims are ripe. *See Conner*, 848 F.2d at 1449–50 (noting that leases permitting surface-disturbing activities subject to conditions do not retain authority to absolutely preclude activities and, therefore, constitute a commitment of resources); *Peterson*, 717 F.2d at 1412, 1414–15 (same).

Though it is true that the criteria may be "conditions" in the sense that BOEM must make certain findings—after notice and an opportunity for a hearing—before disapproving a Construction and Operations Plan and/or cancelling a lease, it does not necessarily follow that "BOEM's own regulations preclude BOEM from changing its mind unilaterally." ECF No. 48 at 20. That is because none of the "conditions" at issue involve or presuppose any transfer of authority to prevent lease activities out of BOEM's hands, which was not the case with the leases in *Peterson* and *Conner*.

*Peterson* involved an oil and gas leasing program for certain National Forests, administered by the United States Forest Service and Department of the Interior ("Department"). 717 F.2d at 1410. The leasing program divided lands into those designated as "highly environmentally sensitive" and "non-highly environmentally sensitive." *Id.* Leases contained either a "No Surface Occupancy Stipulation (NSO Stipulation)"—preventing any surface activities without departmental approval—or stipulations representing "reasonable," "mitigating" conditions on drilling and other activities, but with no ability to bar those activities entirely. *Id.* at 1412, 1414. The D.C. Circuit concluded that the Department had failed to comply with NEPA by neglecting to conduct a full EIS before issuing leases that relinquished the authority to prevent all development. 717 F.2d at 1414. Critical to the Circuit's reasoning was that under the terms of the leases without NSO Stipulations, "the government could not *deny* an application for a permit to drill, but could only enforce the lease stipulations to control and/or mitigate any environmental damage which result[s] from the drilling." *Id.* at 1414 & n.7 (emphasis in original).

*Conner* involved the same legal issue in virtually identical factual circumstances. 848 F.2d at 1444–46 (describing NEPA challenge to leasing program that issued NSO or non-NSO

oil and gas leases in forest land). Citing *Peterson*, the Ninth Circuit concluded that issuing non-NSO oil and gas leases effectively traded the authority to *preclude* all activity for the authority to *regulate* that activity, and such a trade required an EIS. *See id.* at 1450 (emphasis added).[5]

In this case, the criteria at issue do not contemplate trading preclusion authority for regulatory authority. The criteria do not alter the fact that Statoil must submit Site Assessment and Construction and Operations Plans before starting development, or that BOEM retains the authority to prevent any activity in the wind farm area by rejecting any Site Assessment or Constructions and Operations Plan that Statoil submits. The criteria stem from BOEM's commitment to "NEPA's goal of insuring that federal agencies infuse in project planning a thorough consideration of environmental values," *id.* at 1451, and ensuring that NEPA-related preclusion authority is exercised according to due process and for NEPA-related reasons. Accordingly, the presence of these "conditions" does not transform the lease into an irretrievable commitment of resources.[6]

Plaintiffs also contend that their NEPA claims are ripe because the lease is the final word "for the most critical stage of the leasing process—the siting of development," ECF No. 48 at 14, and therefore constitutes an irretrievable commitment of resources. But this contention

---

[5] Although these cases do not address ripeness *per se*, their analysis applies here because an agency's irretrievable commitment of resources also triggers the obligation to conduct an EIS. *See* 848 F.2d at 1450; *CBD*, 563 F.3d at 480.

[6] Plaintiffs also contend that 30 C.F.R. § 585.628(f)(2) constitutes a "condition" on BOEM's right to absolutely preclude development activities, because it indicates that BOEM will give reasons for any disapproval of a Construction and Operations Plan and allow the lessee to resubmit without the identified defects. *Id.* However, as with the other criteria described above, Section 585.628(f)(2) does not appear to require BOEM to relinquish authority to preclude all activity within the leased area. Though the provision does grant the lessee an opportunity to cure any defects in the Plan, it does not confer any right to engage in the equivalent of surface disturbing activities, which still require approval from BOEM.

misrepresents the nature of the lease, which makes no promises other than giving the lessee the exclusive right to survey the area and submit a proposal. *See* NYAR-0046754, 0046760. Indeed, at least part of the purpose of conducting site characterization in the leased area is to determine whether the site is suitable for the proposed purpose. NYAR-0074262 ("After lease issuance, a lessee would conduct surveys and, if authorized to do so pursuant to an approved SAP, install meteorological measurement devices to characterize the site's environmental and socioeconomic resources and conditions and to assess the wind resources in the proposed lease area. A lessee would collect this information to determine whether the site is suitable for commercial development . . . ."). Against this background, the lease sale does not represent the final word on anything, nor does it commit any resources, even putting aside the question of whether it does so irretrievably.[7]

---

[7] Plaintiffs also note in passing that several of the cases addressing ripeness in the context of multi-stage leasing programs identified lease issuance as the point when NEPA claims ripen. ECF No. 48 at 10–11 & n.8; *see also, e.g.*, *CBD*, 563 F.3d at 480 (identifying specific lease sales as point of irreversible and irretrievable commitment). But this interpretation is misleading. *Wyoming Outdoor Council II*—the case upon which more recent cases such as *CBD* and *CSE* relied—described lease issuance as the critical stage for ripeness only as part of an explicit application of the *Peterson* rule. *See Wyoming Outdoor Council II*, 165 F.3d at 49. As this court has already discussed, the heart of the *Peterson* rule is the question of whether the agency retains the authority to preclude all surface disturbing activity. *Peterson*, 717 F.2d at 1414-15; *see also Wyoming Outdoor Council v. Bosworth*, 284 F. Supp. 2d 81, 92–93 (D.D.C. 2003) (noting that *Wyoming II* "based its irreversible commitment finding on the fact that the agency had chosen not to retain its authority to preclude all surface-disturbing activities after lease issuance," that the NEPA claim in the case before it was unripe where lease issuance did not involve relinquishment of preclusive authority or resolution of development contingency, and that ripeness is a "flexible" doctrine, not "a *per se* rule"). In *Wyoming II*, *CBD*, and *CSE*, the agency could not have relinquished its preclusive authority because it had yet to take any specific action under the leasing program. *See CBD*, 563 F.3d at 480 (noting that agency "had only approved the Leasing Program at issue," and that "[n]o lease-sales had yet occurred"); *CSE*, 779 F.3d at 599–600 (same); *Wyo. Outdoor Council II*, 165 F.3d at 49–50 (same). In *Peterson* and *Conner*, ripeness turned on lease issuance because the agency relinquished authority by the terms of the leases. *Peterson*, 717 F.2d at 1414 (noting that since the "decision to allow surface disturbing activities" was made "at the *leasing stage*," NEPA obligations attached at that point) (emphasis in original). But in this case—as in *Bosworth*—the lease does not relinquish preclusive authority. *See* 284 F. Supp. 2d at 93.

For these reasons, Plaintiffs' NEPA claims are not ripe.

## C. OCSLA Violations

Plaintiffs allege that Defendants violated OCSLA by (1) failing to properly consider and provide for fishing, safety, conservation of natural resources, and navigation during both the site selection and the lease issuance process; and (2) adopting a set of regulations that on their face exceed the authority granted by OCSLA. ECF No. 39 at 47, 51–52. Statoil responds that (1) the regulations BOEM adopted were a reasonable interpretation of OCSLA's congressional mandate, ECF No. 40 at 17–19; (2) BOEM considered all relevant OCSLA factors at all relevant stages—through stakeholder meetings and public commentary—before reasonably deciding to adopt some changes and defer consideration of certain potential risks, ECF No. 40 at 19–22; and (3) BOEM's analysis of potential alternatives to development of the wind farm area was adequate. ECF No. 40 at 22–28. BOEM echoes these contentions and further argues that Plaintiffs' OCSLA claims are procedurally barred by their failure to observe the statutorily mandated sixty-day waiting period. ECF No. 42 at 28. The court agrees that Plaintiffs' OCSLA claims are barred for noncompliance with the statute.

OCSLA establishes a private right of action for persons "having a valid legal interest which is or may be adversely affected" by an agency's violation of OCSLA or its associated regulations. 43 U.S.C. § 1349(a)(1). OCSLA also provides that "[e]xcept as provided in paragraph (3) of this subsection, no action may be commenced . . . prior to sixty days after the plaintiff has given notice of the alleged violation, in writing, under oath, to the Secretary." 43 U.S.C. § 1349(a)(2)(A). Compliance with the sixty-day notice period is mandatory, although Section 1349(a)(3) provides an exception when "the alleged violation constitutes an imminent threat to the public health or safety or would immediately affect a legal interest of the plaintiff."

*Id.* § 1349(a)(3). *See Hallstrom v. Tillamook County*, 493 U.S. 20, 23 n.1, 26, 31 (1989) (holding that nearly identical sixty-day notice provision in Resource Conservation and Recovery Act represented a mandatory precondition to suit and expressly noting similarity to 43 U.S.C. § 1349(a)(2)); *Duke Energy Field Servs. Assets, LLC v. Fed. Energy Regulatory Comm'n*, 150 F. Supp. 2d 150, 156 (D.D.C. 2001) ("[T]he citizen suit provision in the instant [OCSLA] case plainly bars *all* cases which do not comply with the provision . . . .") (emphasis in original). Thus, unless they face an imminent threat to public health or safety or some immediate effect on a legal interest, plaintiffs must comply with the sixty-day notice provision. *Hornbeck Offshore Servs., LLC v. Salazar*, 696 F. Supp. 2d 627, 633 (E.D. La. 2010) (citing *Duke Energy*, 150 F. Supp. 2d at 156).

Plaintiffs advance two arguments in support of their compliance with OCSLA's pre-suit requirements: (1) since the lease auction occurred only forty-five days after the Final Sale Notice was published, they did not have sixty days to notify Defendants of their claims before the Final Sale and should therefore be excused from compliance with the sixty-day requirement, ECF No. 48 at 23–24; and (2) their claims fall within Section 1349(a)(3)'s exception because the lease "immediately affect[s] a legal interest of the plaintiff" insofar as it grants Statoil a property interest, along with "attendant rights to condition the access of others," and firmly determines the boundaries of the wind farm area. ECF No. 48 at 24.

Neither of these arguments is persuasive. The fact that there were fewer than sixty days between publication of the Final Sale Notice and the lease sale does not excuse Plaintiffs from compliance with the sixty-day notice period. They have identified no provision of the statute that requires BOEM to schedule its lease sales to accommodate potential claimants, and the plain language of Section 1349(a)(1) contains no ambiguity that is susceptible to such an

interpretation. Rather, as in *Hallstrom*, Plaintiffs essentially argue that the statute "should be given a flexible or pragmatic construction" that would accommodate their view of the equities. 493 U.S. at 26. The court declines to engage in such an exercise. Congress has already addressed this situation in Section 1349(a)(1), which contains "explicit and unambiguous" language that "must be given palpable effect." *Duke Energy*, 150 F. Supp. 2d at 155; *see also Hallstrom*, 493 U.S. at 27 (noting in analogous context that "[g]iving full effect to the words of the statute preserves the compromise struck by Congress"). Against this background, the court sees no justification for adopting an interpretation of Section 1349(a)(1) that "flatly contradicts the language of the statute." *Hallstrom*, 493 U.S. at 27.

Moreover, Congress provided for situations in which the rigid sixty-day notice requirement of Section 1349(a)(1) would create unacceptable hardship by carving out an exception for exigent circumstances. *See* 43 U.S.C. § 1349(a)(3). To be eligible for that exception, a plaintiff must (1) provide notice of the alleged violation, and (2) demonstrate an imminent threat to public health or safety or that the alleged violation would immediately affect a plaintiff's legal interests. 43 U.S.C. § 1349(a)(3). While Plaintiffs in this case provided notice, and even signaled their intention to invoke the provision in their notice letter, ECF No. 3-1 at 148, they have failed to demonstrate any imminent threat to public health or safety, or any immediate effect on their legal interests that would authorize their claim under Section 1349(a)(3). As noted earlier, the lease has no immediate effect except to grant Statoil the right to submit an Site Assessment Plan and, potentially, a Construction and Operations Plan. Nothing in the lease authorizes Statoil to exclude others from the leased area or condition access to that area, and to the extent that the lease grants a type of property interest to Statoil, this grant fails to

satisfy Section 1349(a)(3), which concerns the effect on a plaintiff's legal interest.  *See* 43 U.S.C. § 1349(a)(3).

This case therefore differs from those in which the requirements of Section 1349(a)(3) were met.  *See Chevron, U.S.A., Inc. v. FERC*, 193 F. Supp. 2d 54, 64–65 (D.D.C. 2002) (finding Section 1349(a)(3) satisfied where agency intended to "disclose the plaintiffs' commercially sensitive information within five days," which "would detrimentally affect the plaintiffs' legal interest in preserving the confidentiality of the information and in maintaining its suits [challenging disclosure orders]"); *Hornbeck*, 696 F. Supp. 2d at 636 n.8 (noting in alternative that immediate loss of business relationships satisfied requirements of Section 1349(a)(3)). Here, compliance with the sixty-day notice period would not have caused any immediate injury or loss of a legal right.  Accordingly, Plaintiffs cannot invoke Section 1349(a)(3), and their OCSLA claims are barred for failure to comply with the terms of Section 1349(a)(1).

## IV.    CONCLUSION

For the foregoing reasons, the court hereby concludes that Defendants' Motion for Summary Judgment will be GRANTED, Plaintiffs' Motion for Summary Judgment will be DENIED, and Defendant-Intervenor's Motion will be DENIED AS MOOT.  An appropriate order accompanies this memorandum opinion.

Date:  September 30, 2018


TANYA S. CHUTKAN
United States District Judge