## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

FISHERIES SURVIVAL FUND, *et al.*,

        Plaintiffs,

v.

RYAN ZINKE, *et al.*,

        Defendants,

    and

EQUINOR WIND US LLC,

        Defendant-Intervenor.

Case No. 1:16-cv-02409 (TSC)

## DEFENDANT-INTERVENOR'S OPPOSITION TO
## PLAINTIFFS' MOTION TO ALTER OR AMEND JUDGMENT

Defendant-Intervenor Equinor Wind US LLC ("Equinor Wind"),[1] by and through its attorneys, respectfully submits this opposition to Plaintiffs' motion to alter or amend judgment ("Pl. Mot.") [#61].

## I.    INTRODUCTION

Plaintiffs' request to alter or amend the Court's September 30, 2018 Memorandum Opinion and Order (together, "Opinion") should be denied because the material Plaintiffs submit as new evidence that their NEPA claims have ripened is neither new nor relevant to the facts and legal underpinnings of the Court's Opinion in this case. Motions for reconsideration under Rule 59(e) are granted by this Court only under extraordinary circumstances. Plaintiffs have failed to establish any intervening change of controlling law, the availability of new evidence, or any need

---

[1] Statoil Wind US LLC was renamed Equinor Wind US LLC; BOEM recently amended the lease to reflect this name change.

to correct a clear error or prevent manifest injustice in this case that would justify reconsideration. Therefore, Equinor Wind joins with the Government Defendants in opposing Plaintiffs' motion.

## II.    ARGUMENT

Plaintiffs have not met the standard for altering or amending the judgment.  Although this Court has discretion in ruling on a Rule 59(e) motion to alter or amend a judgment, this Circuit has made clear that such a motion "need not be granted unless the district court finds that there is an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice."  *Firestone v. Firestone*, 76 F.3d 1205, 1208 (D.C. Cir. 1996) (internal quotations omitted).  Moreover, "[a] Rule 59(e) motion to reconsider is not simply an opportunity to reargue facts and theories upon which a court has already ruled," *New York v. United States*, 880 F.Supp. 37, 38 (D.D.C. 1995), or a vehicle for presenting theories or arguments that could have been advanced earlier, *see Kattan v. Dist. of Columbia*, 995 F.2d 274, 276 (D.C. Cir. 1993).  This Court has stated that motions for reconsideration under Rule 59(e) are "generally disfavored" and "should be granted only under extraordinary circumstances."  *Moses v. Dodaro*, 856 F. Supp. 2d 99, 102 (D.D.C. 2012), *aff'd*, 685 F. App'x 1 (D.C. Cir. 2017).

Here, Plaintiffs argue that the announcement of long-term power purchase agreements ("PPAs") between certain states and electric distribution companies constitutes new evidence bearing on their challenge to BOEM's decision to issue to Equinor Wind the lease for the New York Wind Energy Area ("NYWEA").  Pl. Mot. at 6-9.  To the contrary, the PPAs necessarily had no impact on the federal agency's decision challenged in this lawsuit; the PPAs all post-date BOEM's decision and therefore could not have been part of BOEM's consideration.[2]  It is axiomatic that judicial review under the Administrative Procedure Act is limited to the

---

[2]  BOEM and Statoil Wind executed the lease in March of 2017.  The announcements Plaintiffs ask the Court to consider were made on May 23, 2018, June 13, 2018, and July 31, 2018.

administrative record that was considered by the agency when it made the decision at issue. *Theodore Roosevelt Conservation P'ship v. Salazar*, 616 F.3d 497, 514 (D.C. Cir. 2010). Plaintiffs have not established any exception to this rule. *See id.* (noting exceptions for a strong showing of bad faith or improper behavior or when the record is so bare that it prevents effective judicial review).

Plaintiffs' motion is also belated in bringing to the Court's attention the purported new evidence, as each PPA announcement upon which Plaintiffs rely occurred before the Court issued its Opinion on September 30, 2018.[3]  Late notice does not make the material "new evidence" appropriate for reconsideration under Rule 59(e). *See, e.g.*, *Moses v. Dodaro*, 856 F. Supp. 2d at 104 ("Courts routinely deny Rule 59(e) motions where all relevant facts were known by the party prior to the entry of judgment and the party failed to present those facts.").

The PPAs are also substantively irrelevant to BOEM's decision-making.  The PPAs referenced by Plaintiffs do not involve BOEM, the NYWEA, or the lease issued to Equinor Wind. The PPAs described in the motion are commercial agreements between an offshore wind facility developer and public utilities serving Massachusetts. Pl. Mot. Ex. 7-12 (hereinafter, "Exhibits" or "Exhibit").  No aspect of these agreements binds BOEM, alters the decision made by BOEM to issue leases to those offshore wind facility developers, or expands the authority granted in their leases.  Even if New York were to announce the execution of a PPA between public utilities and Equinor Wind in relation to the NYWEA, the lease still would not authorize construction or operation of a wind project in the NYWEA.  Without such an authorization, Plaintiffs' claims are not ripe. *See* Opinion at 16-20.

---

[3] On June 29, 2018, Plaintiffs moved for judicial notice of certain comments of the National Marine Fisheries Service. Three of the four announcements referenced in the instant motion had been made at the time of the June 29 motion.

Accordingly, this motion should be denied.[4]

**A.      Power Purchase Agreements have no bearing on the legal rights at issue in this case.**

The execution of PPAs for the long-term acquisition of energy, capacity, and renewable energy credits ("RECs") does not impinge on BOEM's authority, nor can it.  In the context of offshore wind development, PPAs – like the PPAs offered by Plaintiffs – are commercial agreements between the developer and the buyer detailing the price and the products to be delivered, the term of the agreement, the consequences for failure to perform, and other key contractual provisions.  *See* Exhibits 7-12.  PPAs have no bearing on the authority or rights of a governmental regulator, like BOEM, or on the lease, which is a separate legal instrument, issued pursuant to BOEM's authority under the Outer Continental Shelf Lands Act.  Governmental regulators, such as BOEM, are typically not parties to PPAs, and indeed BOEM has no role or obligations in the PPAs submitted by Plaintiffs.  *Id*.  BOEM typically has no role in the commercial terms under which a buyer procures energy, capacity, and RECs from an offshore wind developer, and PPAs neither compel the construction and operation of an offshore wind facility nor compel BOEM to authorize the construction and operation of such a facility.  To be clear, BOEM's authority and duties under OCSLA and its implementing regulations are in no way constrained or augmented simply because a developer executes a commercial contract like a PPA.

The commercial terms of PPAs commonly recognize and address the uncertainty of permitting processes administered by regulatory agencies, such as BOEM.  For instance, PPAs governing energy, capacity, and RECs for proposed facilities that have not been constructed and which lack regulatory approvals typically contain conditions obligating the project developer to

---

[4] For the same reasons stated herein, Plaintiffs' motion for judicial notice of this material, Pl. Mot. at 9-10, should be denied.

obtain all necessary government approvals.  Failure of the developer to obtain the necessary permits allows the buyer to avoid paying for energy products from a project that may never be built.  This risk sharing is addressed contractually in PPAs through various escape clauses, termination rights, potential penalties, or rights to alternative supply.  Indeed, the PPAs submitted by Plaintiffs have many of these features.  *See*, *e.g*., Exhibit 7, § 9 (allowing termination of the PPA if the developer fails to secure necessary permits); Exhibit 8, § 9 (same).

     **B.**     **States and developers enter into commercial agreements despite uncertainty about final project development.**

Executing a PPA and other contracts before an offshore wind facility enters operation is standard practice for a project developer and future buyer.  A PPA is but one such contract, and it often provides additional support to allow project development to proceed by identifying a buyer and setting forth the commercial terms of future sales.  As commercial entities, project developers may enter other contracts, including those related to the financing of the project, legal and technical expertise, real estate rights, equipment supply and manufacturing, and other needs.  Execution of these contracts helps enable the further development of a project but does not guarantee or authorize construction and operation of an offshore wind facility.

As noted, the uncertainty associated with developing highly regulated offshore wind facilities is addressed, in part, by the use of conditions or other mechanisms in a PPA to apportion risk.  For instance, should a buyer enter into a contract with a facility developer, it should not reasonably expect to remain liable for purchase obligations from a generator that is never constructed because of the developer's failure to secure the necessary approvals.  However, the conditional purchase obligation is an important step in securing market-based or internal funding for continued development of a proposed project.

States and utilities may rationally enter into PPAs with project developers for a range of reasons.  For example, a state may seek to assure, years ahead of time, that it has the required optionality, sufficiency, and continuity of its power supply.  Additionally, state agencies may seek to assure compliance with statutorily required renewable energy goals.  Awaiting the development, construction, and operation of needed offshore wind facilities, without the use of a risk-apportioning PPA, may result in a state's failure to meet its energy procurement goals or renewable portfolio requirements.  Similarly, state reliance on the spot market also may be misguided because there may be no qualifying energy, capacity, and RECs available absent the appropriate contractual obligations to incentivize the construction and operation of an offshore wind facility years in advance.

Moreover, from the developer's perspective, it may not be reasonable to commit to spending billions of investment dollars on the development, construction, and operation of an offshore wind project that may have no off-taker or no sustainable source of revenue.  In effect, the PPA, with its conditions and risk sharing provisions, provides the appropriate market signal to the developer that such a project is needed.  But, execution of the PPA does not compel a regulator, such as BOEM, to approve the development, construction, or operation of any offshore wind facility.

Plaintiffs allege that "reliance and financial interests" created by leases create too much momentum for BOEM to prohibit project development.  Mot. at 7.  However, as explained above, neither execution of a PPA by a lease holder nor commercial momentum changes BOEM's role in regulating the development of offshore wind facilities.  BOEM is typically not a party to PPAs, including those submitted by Plaintiffs, and BOEM's right to "pull the plug," *id.*, and deny any and all approvals remains unquestionably unchanged.

## III.    CONCLUSION

This Court determined that Plaintiffs' NEPA claims were unripe because the limited scope of BOEM's leasing decision did not authorize or irretrievably and irreversibly commit BOEM to authorize any phase of development that could allegedly result in the harms of which Plaintiffs complained.  Legally and factually, nothing in the proffered material changes the scope of the leasing decision or irretrievably and irreversibly commits the agency to action.  In fact, the materials referenced by Plaintiffs do not relate to BOEM, Equinor Wind, the NYWEA lease, or any development of the NYWEA.

Accordingly, Equinor Wind respectfully requests that the Court deny Plaintiffs' motion.

Dated:   November 13, 2018

Respectfully submitted,

 /s/  Kevin A. Ewing
Kevin A. Ewing (D.C. Bar #440444)
Laura Prebeck Hang (D.C. Bar #888314184)
BRACEWELL LLP
2001 M Street NW, Suite 900
Washington, DC 20006
Telephone:  (202) 828-7638
Facsimile:  (800) 404-3970
Email:   kevin.ewing@bracewell.com
            laura.hang@bracewell.com

and

Rachel B. Goldman (admitted *pro hac vice*)
BRACEWELL LLP
1251 Avenue of the Americas, 49th Floor
New York, New York  10020
Telephone:  (212) 508-6135
Facsimile:  (212) 938-3835
Email: rachel.goldman@bracewell.com

***Counsel for Defendant-Intervenor***
***Equinor Wind US LLC***

**<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that on this 13th day of November 2018, a true and complete copy of the foregoing *Defendant-Intervenor's Opposition to Plaintiffs' Motion to Alter or Amend Judgment* has been filed with the Clerk of the Court pursuant to the Court's electronic filing procedures, and served on counsel of record via the Court's electronic filing system.


  */s/ Kevin A. Ewing*
Kevin A. Ewing (D.C. Bar #440444)